Filed 9/16/22  P. v. Decoud CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>BRIAN DECOUD,<br><br>    Defendant and Appellant. | B310245<br>(Los Angeles County<br> Super. Ct. No. SA019351) |

APPEAL from an order of the Superior Court of Los Angeles County, Mark E. Windham, Judge.  Affirmed.

Kelly C. Martin, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Idan Ivri and Rene Judkiewicz, Deputy Attorneys General, for Plaintiff and Respondent.

In 1995, a jury convicted defendant Brian Decoud of second degree murder (Pen. Code § 187, subd. (a)),[1] and found that he personally used a

---

[1]     Undesignated statutory references are to the Penal Code.

firearm in the commission of the crime (§ 12022.5, subd. (a)). We affirmed the judgment in an unpublished opinion in 1997,[2] and the California Supreme Court denied review. In 2019, defendant filed a petition for resentencing under former section 1170.95, now section 1172.6.[3] (Hereafter we will refer to the statute by its current designation, section 1172.6.) After an evidentiary hearing, the trial court denied the petition.

Defendant appeals from that ruling. He contends that because the trial court relied on the transcript of the 1995 trial (there was no live testimony), this court must independently review the court's decision on the same record, rather than apply the substantial evidence standard. Moreover, he challenges the sufficiency of the evidence to prove he aided and abetted the commission of second degree implied malice murder, and he also challenges the court's application of the law regarding implied malice. We reject these contentions and affirm the denial of his petition for resentencing.

## FACTUAL BACKGROUND[4]

1.  *Prosecution Evidence*

---

[2]   Our prior appellate opinion has not been made part of the appellate record.

[3]   Effective June 30, 2022, section 1170.95 was renumbered 1172.6 without substantive change. (Stats. 2022, ch. 58, § 10.)

[4]   We recite the factual background based on the reporter's transcript of defendant's trial.

In February 1994, defendant (known as "Iceberg") was living in room 6 and later room 16 at the Kings Lodge Motel on Venice Boulevard. During that period, Kermith Stanley Johnson, his girlfriend Regina Nixon, and his daughter Shadona Johnson were living in room number 12 at the Kings Lodge Motel.[5] On occasion Kermith's son, Stanley Johnson ("Little Stan" or "Grump") also stayed with them at the Kings Lodge Motel.

Defendant and Stanley each sold drugs out of their respective motel rooms. Kermith, who was friends with defendant, testified that defendant did not "regularly" carry a gun and never carried one while socializing inside Kermith's room (number 12). Stanley did not carry a gun.

Stanley was shot and killed inside room number 12 on February 25, 1994. He was shot four times; two of the shots were independently fatal.

A.      *Events Preceding the Shooting*

The week before Stanley was killed, Kermith heard defendant tell Stanley that Stanley owed defendant money and had to "move out" of the Kings Lodge Motel. Stanley said he would promptly leave the motel.

In the late evening of February 24, 1995 (the night before the shooting), Kermith saw defendant firing a gun in front of the Kings Lodge Motel across Venice Boulevard.[6] Defendant disappeared for several hours before he returned to the motel. He yelled and knocked on the door to room number 12,

---

[5]      We refer to Kermith, Shadona, Stanley, Stanley's brother, Curtis Johnson, and a man named Joe Johnson by their first names because they do (or did) share a surname. We intend no disrespect.

[6]      In addition to the charge of murder, defendant was tried and convicted of several crimes arising from his actions on February 24, 1994. We omit the factual background of those crimes except where relevant to the shooting of Stanley.

causing Shadona to wake up. Shadona opened the door and saw defendant with a man and two women; defendant yelled, "Tell your brother that he got to be out of here by eleven o'clock tomorrow, unless it's going to be something." Defendant and his companions left, and Shadona called Stanley to tell him about the incident.

Around 1:30 p.m. on February 25, 1994, Shadona saw defendant in the motel parking lot sitting inside a green truck with a woman Shadona had seen with defendant the night before. Defendant asked for Stanley to "come out" of room number 12 to "go somewhere" to talk. Stanley declined. Defendant returned an hour later and tried again, but Stanley refused. At some point during the day, Kermith saw a man named Christopher Mack ("Jean Nut") and one of Stanley's long-time friends named Joe ("Blue") at the Kings Lodge Motel.

## B.    *The Shooting of Stanley*

The shooting of Stanley took place inside room number 12 around 6:05 p.m. on February 25, 1994. Percipient witnesses to the shooting were Kermith, Shadona, and Stanley's sister-in-law, Misty Sanders-Johnson.

### 1.    *Kermith*

Around 6:00 p.m., Kermith was sitting inside room number 12 near the open front doorway. Through the doorway he observed defendant in the motel parking lot wearing a large jacket and hood. Behind him were two or three men who appeared as if they "just . . . didn't belong around there." Defendant walked up to Kermith and asked if Stanley was inside his motel room. Kermith said he was, and asked about the other men in the parking lot. Defendant replied that they "were with him" and were his "homeboys."

4

Defendant walked inside the motel room. Kermith and Stanley stood in the living room area. Sitting on the living room couch were Shadona and Sanders-Johnson.

Kermith again inquired if the men in the parking lot were with defendant. Defendant replied, "Yeah," and "kind of yelled to them" to come over. One of the men came to the door, and defendant said "let him in" or "come on in." Kermith told the man to wait because defendant would be out in a few minutes. However, Stanley said that he knew the man at the doorway as "Gene" or "Gino," so Kermith let the man enter. Defendant began telling Stanley that he owed defendant money. Stanley replied that he had already paid defendant.

Kermith went into the bedroom. Moments later, he heard "a ruckus going on" and walked back into the living room area where he saw defendant and Stanley engaged in a struggle on the ground. Defendant was on top of Stanley and holding a .9 millimeter firearm. The man Stanley called Gino was sitting on the living room couch holding a "large revolver" and pointing it down at Stanley. The man walked toward Stanley and told everyone not to move. Shadona ran from the living room and "pull[ed]" Kermith along into the bedroom. Kermith heard two or three gunshots, and ran back into the living room area. He saw Stanley lying on the floor; defendant and the man called Gino were gone.

### 2.  *Shadona*

Around 6:00 p.m. Shadona, Sanders-Johnson, Stanley, and possibly another man (Joe) were inside the living room area of room number 12. Defendant, wearing a green jacket and hood, entered the room, and appeared nervous as he talked with Stanley about "owing each other money." Both

5

men talked in the bedroom for several minutes before walking into the living room and kitchen area. Stanley sat on a chair as defendant remained standing. Kermith walked in and spoke briefly with defendant.

Seconds later, a man wearing a jacket and hood walked into the motel room. Someone said, "don't let him in like that," to which defendant replied, "He's with me." Stanley recognized the man and called him "Garth." The man entered and sat on the edge of the living room couch. As Shadona began to walk towards the bedroom, the man Stanley called Garth pulled out a handgun from under his jacket and pointed it at Stanley. Stanley asked, "What's going on?" The man replied, "It's a hold up." Defendant stood over Stanley, pulled out his own gun, and pointed it at Stanley. "Garth" "ran up" and fired a shot at Stanley. Shadona saw another man, whom she identified as Christopher Mack, come into the motel room carrying his own gun. Kermith, Shadona, and Sanders-Johnson ran into the bedroom before Shadona heard five additional gunshots.


### 3. *Sanders-Johnson*

While sitting inside room number 12 around 6:00 p.m., Sanders-Johnson saw defendant walk inside wearing a coat and a hood draped over his head. After spending several minutes in the bedroom, defendant and Stanley walked into the kitchen and living room area, speaking about drugs and defendant being owed money. Another man (whom Sanders-Johnson identified as Stanley's friend Joe) was at the front doorway, and Kermith was just outside the door.

Kermith walked into the motel room with yet another man whom someone (Sanders-Johnson couldn't recall who) identified as "Gino." The man called Gino sat on an arm of the living room couch as Kermith walked

6

into the bedroom. Gino pulled out a large handgun, pointed it toward the kitchen area, and ran across the room "directly in front of" Stanley, who was sitting in a chair. Gino fired one gunshot and ran toward Joe, who had pulled out his own gun, and both men ran out of the front doorway. Defendant also pulled out a gun from under his coat and shot Stanley once. Sanders-Johnson and Shadona ran into the motel bedroom.

C. *Investigation and Gang Evidence*[7]

The investigating officer in this case, Los Angeles Police Department Detective Shands McCoy, testified that he responded to the Kings Lodge Motel around 9:00 p.m. on February 25, 1994. McCoy and several officers searched for but did not find any bullets, bullet fragments, or casings at the scene. McCoy believed that one or perhaps two revolvers were used during the shooting. However, a ballistic comparison showed that the one bullet and three bullet fragments recovered from Stanley's body had been fired from the same .44 caliber revolver.

Several months after the shooting, defendant was arrested at the home of Christopher Mack, whom Kermith had seen at the King's Lodge Motel on the afternoon of February 25, 1994, before the shooting that night and who Shadona named as one of the armed men in the motel room immediately before the murder. McCoy testified that defendant and Mack were both known members of the Playboy Gangster Crips gang (PGC), and Stanley was a known member of another Crip gang called Pomona 357. Members of PGC sold drugs in the gang's territory, which encompassed the Kings Lodge Motel.

---

[7] A gang enhancement allegation was not charged. Over defendant's objection, the court admitted the limited gang evidence to establish motive.

While a member of another gang could sell drugs in PGC territory, he or she could only do so if the gang formed a partnership with PGC and paid "rent" to PGC. If rent was left unpaid, PGC would fight the other gang, or worse PGC members would "go and try to kill the person" for unpaid rent.

2. *Defense Evidence*

Defendant testified that he was a "little O.G." from PGC, and he sold drugs out of the Kings Lodge Motel. Defendant never charged Stanley "rent" for selling drugs, and defendant never threatened Stanley before the shooting. Defendant admitted, however, that at 11:00 a.m. and again around 5:00 or 6:00 p.m. on February 25, 1994, he was driven to the Kings Lodge Motel by a woman named Sonia who was also a member of PGC.

The night of the shooting, defendant walked by himself to room number 12 to talk with Kermith about Stanley owing him money. Defendant carried a gun on him but had no plan to shoot, scare, or rob anyone. After Joe let him inside room number 12, defendant spoke with Kermith and Stanley in the living room area. As they talked, defendant looked through the doorway and saw three unknown men in the parking lot. According to defendant, it was Stanley who said that the men outside in the parking lot were his "homeboys. They all right. They can come in." The three men walked into the motel room, and one of the men Stanley called "Wolfie" pulled out a semi-automatic gun. Defendant and Joe ran outside and across Venice Boulevard, at which time defendant heard several gunshots. Defendant never pulled out his gun the night of the shooting.

Defendant also called Laurisla Logan to testify on matters not relevant to this appeal.

8

3.    *Information, Verdict, and Sentence*

An information charged defendant with, inter alia, the murder of Stanley (§ 187, subd. (a)), and alleged that defendant had personally used a firearm during the commission of murder (§ 12022.5, subd. (a)).

At trial, the jury was instructed on multiple theories of murder, including first degree premeditated murder, second degree express malice murder, and second degree implied malice murder.[8]  The jury was also instructed on principles of aiding and abetting that included the natural and probable consequences doctrine.  To find the firearm enhancement to be true, the jury was instructed that it had to find defendant must have "display[ed] a firearm in a menacing manner, intentionally . . . fire[d] it or intentionally . . . [struck] or hit a human being with it."

On June 12, 1995, the jury found defendant guilty of murder in the second degree, and found the firearm enhancement allegation to be true. Defendant was sentenced to 15 years to life for murder, plus four years for the firearm enhancement.

## PROCEDURAL BACKGROUND

In March 2019, defendant filed a petition for resentencing under section 1172.6.  The trial court appointed counsel for defendant, received briefing by the parties, and issued an order to show cause.

---

[8]    Regarding implied malice murder, the jury was instructed as follows: "Murder of the second degree is also the unlawful killing of a human being when: [¶]  One, the killing resulted from an intentional act.  [¶]  Two, the natural consequences of the act are dangerous to human life.  [¶]  And three, the act was deliberately performed with knowledge of the danger to and with conscious disregard[] for human life."

9

At the evidentiary hearing on defendant's petition, the parties agreed that the only evidence the court would consider was the testimony and evidence presented at trial and the preliminary hearing. That testimony, according to the prosecutor, established beyond a reasonable doubt that defendant aided and abetted second degree murder under express or implied malice, and established an uncharged theory of felony murder predicated on attempted robbery. Defense counsel objected to the use of a felony murder theory, which had never been charged or presented to the jury for determination. In light of the objection, the court declined to apply the felony murder theory despite finding that the evidence established "beyond a reasonable doubt . . . that the killing was in the course of an attempted robbery where the defendant showed reckless indifference to life and was a major participant."

After conducting its own review of the trial testimony and briefs filed by the parties, the court stated that it found the evidence demonstrated that defendant "was acting, yes, under implied malice. Also, I think under an aiding and abetting theory . . . [t]his was not an unrelated coincidence type of crime . . . . [Defendant] was involved, quite clearly knew what was happening, and did what he could to aid and abet the shooting and the crime." Following additional argument by defense counsel and the prosecutor, the court stated: "I think this is outrageous and shocking conduct that implies malice, the acts. He should have known that this would result in death. It's reckless indifference to life. It's implied malice. And beyond all reasonable doubt, also he aided and abetted the killing. I find that as true also. So all of those theories support—would support the conviction, do support his conviction." The court denied the petition.

10

**DISCUSSION**

Defendant contends that because the trial court considered the "cold record" of the trial, we should apply an independent standard of review. Defendant challenges the sufficiency of the evidence under that standard of review, or alternatively under the traditional substantial evidence standard of review. He also contends the trial court applied incorrect legal standards when finding that he acted with implied malice.

1.      *Governing Legal Principles: Current Section 1172.6*

Through Senate Bill No. 1437 (Stats. 2018, ch. 1015, § 1), the Legislature limited accomplice liability under the felony-murder rule and eliminated the natural and probable consequences doctrine as it relates to murder, to ensure that a person's sentence is commensurate with his or her individual criminal culpability. (*People v. Gentile* (2020) 10 Cal.5th 830, 842–843; *People v. Lewis* (2021) 11 Cal.5th 952, 957, 971; accord, § 189, subd. (e).) Senate Bill No. 1437 also added former section 1170.95 (now section 1172.6), which created a procedure in which individuals convicted of murder under a now-invalid theory based on the natural and probable consequences doctrine (or any other theory for which malice is imputed based solely on a person's participation in a crime) may petition to vacate their convictions and for resentencing. (§ 1172.6, subd. (a).)

Where, as here, the petitioner has made a prima facie showing of entitlement to relief, the trial court must issue an order to show cause and then hold a hearing to determine whether to vacate the murder conviction, recall the sentence, and resentence the petition on any remaining counts. (§ 1172.6, subds. (c)-(d)(1).) The prosecution has the burden to prove beyond a reasonable doubt that the petitioner is guilty of murder under the amended

11

law.  (§ 1170.95, subd. (d)(3).)  At the hearing, the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law; the parties may also offer new or additional evidence to meet their respective burdens.  (*Ibid.*)

2.    *Standard of Review*

Appellate courts have uniformly applied the substantial evidence standard when reviewing the denial of a section 1172.6 petition following an evidentiary hearing.  (E.g., *People v. Owens* (2022) 78 Cal.App.5th 1015, 1022; *People v. Cooper* (2022) 77 Cal.App.5th 393, 411; *People v. Clements* (2022) 75 Cal.App.5th 276, 301 (*Clements*); *People v. Garrison* (2021) 73 Cal.App.5th 735, 747.)  Under that familiar standard, "we review the record 'in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'"  (*People v. Westerfield* (2019) 6 Cal.5th 632, 712; see *People v. Bolin* (1998) 18 Cal.4th 297, 331.)  "'We resolve neither credibility issues nor evidentiary conflicts . . . .'  [Citation.]"  (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

Notwithstanding the uniform application of substantial evidence in this context, defendant contends that whenever the trial court relies on a "cold record," we should instead conduct an independent review.  Defendant admits this argument was rejected in *Clements, supra,* 75 Cal.App.5th 276.  In that case, the court held that the substantial evidence standard applies to the trial court's decision, based on the reporter's transcript of the prior trial, that beyond a reasonable doubt the defendant is guilty of murder under current law.  (*Id.* at p. 301 [because the trial court's determination is "predominantly

12

. . . factual," substantial evidence review applies regardless of whether the trial relies on a "cold record"]; accord, *People v. Perez* (2018) 4 Cal.5th 1055, 1066 ["we see no reason to withhold the deference generally afforded" to predominantly factual findings "even if the trial court is bound by and relies solely on the record of conviction to" make such finding].)

We agree with *Clements* that the question of guilt under the law as amended by Senate Bill No. 1437 is predominantly a factual determination. The authority cited by defendant does not persuade us otherwise. (See, e.g., *People v. Vivar* (2021) 11 Cal.5th 510, 524, 526–527 [adequacy of counsel's advice regarding immigration consequences of criminal plea and of resulting prejudice were "predominantly questions of law"]; *People v. Waidla* (2000) 22 Cal.4th 690, 730 [ruling on motion to suppress confession entailed "a measurement of the facts against the law" and was not "predominantly factual"].) Thus, we see no reason to depart from the application of the substantial evidence standard of review.

3. *Defendant Aided and Abetted Implied Malice Murder*

Defendant contends the evidence does not support a finding that he aided and abetted the killing of Stanley with express or implied malice. We disagree.

Second degree murder is the unlawful killing of a human being with malice aforethought but without willfulness, premeditation, and deliberation. (§ 187, subd. (a); *People v. Cravens* (2012) 53 Cal.4th 500, 507 (*Cravens*).) Malice may be express, as when the defendant manifests a deliberate intention to kill, or implied. (§ 188, subd. (a); *People v. Covarrubias* (2016) 1 Cal.5th 838, 890.) Malice is implied "when the killing resulted from an intentional act, the natural consequences of which are dangerous to human

13

life, performed with knowledge and conscious disregard for the danger to human life." (*People v. Thomas* (2012) 53 Cal.4th 771, 814; *People v. Soto* (2018) 4 Cal.5th 968, 974.) "'In short, implied malice requires a defendant's awareness of engaging in conduct that endangers the life of another . . . .' [Citation.]" (*Cravens, supra,* 53 Cal.4th at p. 507.)

Principals to a crime include those who directly commit the act constituting the offense, and those who "aid and abet" in the commission of the offense. (§ 31.) Our Supreme Court has advised that "the dividing line between the actual perpetrator and the aider and abettor is often blurred. It is often an oversimplification to describe one person as the actual perpetrator and the other as the aider and abettor. When two or more persons commit a crime together, both may act in part as the actual perpetrator *and* in part as the aider and abettor of the other, who also acts in part as an actual perpetrator." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1120 (*McCoy*); accord, *People v. Thompson* (2010) 49 Cal.4th 79, 118 ["'one person might lure the victim into a trap while another fires the gun'"].)

To be guilty of aiding and abetting *express* malice murder, the defendant must "share the murderous intent of the actual perpetrator," aid, promote, encourage, or instigate by act or advice the commission of murder, and possess ""knowledge of the criminal purpose of the perpetrator *and* [ ] an intent or purpose either of committing, or of encouraging or facilitating"" the commission of murder. (*McCoy, supra,* 25 Cal.4th at p. 1118.)

Liability for direct aiding and abetting *implied* malice murder requires proof that (1) the direct perpetrator committed "a life-endangering act" that resulted in a death; (2) the aider and abettor knew that the perpetrator intended to commit the act; (3) the aider an abettor knew that the act was dangerous to human life, and done with conscious disregard for human life;

14

and (4) the aider an abettor aided the commission of the life-endangering act by words or conduct. (*People v. Powell* (2021) 63 Cal.App.5th 689, 713 (*Powell*); accord, *People v. Superior Court (Valenzuela)* (2021) 73 Cal.App.5th 485, 499 ["*Powell* is entirely consistent . . . in basing murder liability on the aider and abettor's own state of mind"].)

Here, ample evidence established that defendant and the man called Gino in Kermith and Sanders-Johnson's testimony and Garth in Shadona's testimony committed the shooting and attempted armed robbery of Stanley in part as actual perpetrators and in part as aider and abettors. The plan by defendant and Gino/Garth to violently attack Stanley is readily inferable. (See *People v. Campbell* (1994) 25 Cal.App.4th 402, 409 [factors to consider when determining aiding and abetting include "'presence at the scene of the crime, companionship, and conduct before and after the offense'"].) Both men wore a hood and jacket that concealed their own firearms; both were in close proximity to one another before, during, and after the shooting; and both men knew each other, as defendant had identified Gino/Garth as one of his "homeboys."

Defendant committed acts necessary to the shooting and attempted robbery—he confronted Stanley about money while concealing his own firearm. Then, after securing Gino/Garth's presence inside the motel room, defendant brandished his firearm to either fire inside the motel room or use to strike or hit a human being. Gino/Garth, too, actively committed acts necessary to the attempted robbery—he told everyone, "It's a holdup," and fired several shots in Stanley's direction. Whoever fired the fatal shots, the conduct of *both* defendant and Gino/Garth not only made them actual perpetrators; it also made them aiders and abettors of each other in

15

accomplishing their joint purpose of either killing Stanley or taking money from him by deadly force.

Thus, substantial evidence supports the trial court's finding that a trier of fact could find beyond a reasonable doubt that defendant aided and abetted implied malice second degree murder. To the extent defendant characterizes the evidence differently and asks us to draw conclusions contrary to the ones reached by the trial court, his argument fails. (See *People v. Nguyen* (2015) 61 Cal.4th 1015, 1055 ["'the relevant question is whether . . . *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt"].)[9]

4.     *The Trial Court Did Not Mistakenly Apply the Law*

Defendant next contends that the trial court improperly applied the law when it issued its ruling from the bench. We disagree.

In a criminal bench trial, the court is not required to provide a statement of decision. (*People v. Grana* (1934) 1 Cal.2d 565, 571 (*Grana*).) Any remarks by a trial court during a bench trial generally cannot be used to show that the trial court misapplied the law or erred in its reasoning. (*People v. Tessman* (2014) 223 Cal.App.4th 1293, 1302–1303 (*Tessman*); see *Ross v. Superior Court* (1977) 19 Cal.3d 899, 914; *Grana, supra*, at p. 571.) One exception to this broad proposition is when, "*taken as a whole*, the judge's statement discloses an incorrect rather than a correct concept of the relevant law, 'embodied not merely in "secondary remarks" but in [the judge's] basic ruling.' [Citations.]" (*Tessman, supra*, at pp. 1302–1303, quoting *People v.*

---

[9]     In light of our conclusion, we do not consider the Attorney General's alternative contention that sufficient evidence also supports an uncharged theory of felony murder.

*Ortiz* (1964) 61 Cal.2d 249, 253.) In other words, "the court's comments [must] unambiguously disclose that its basic ruling embodied or was based on a misunderstanding of the relevant law." (*In re Jerry R.* (1994) 29 Cal.App.4th 1432, 1440.)

Here, defendant focuses on the following statements made by the court (which we have italicized for emphasis): "I think this is *outrageous and shocking conduct* that implies malice, the acts. He *should have known that this would result in death*. It's *reckless indifference to life*. It's implied malice. And beyond all reasonable doubt, also he aided and abetted the killing. I find that as true also. So all of those theories support—would support the conviction, do support his conviction." (Italics added.) In defendant's view, the foregoing statements constitute a misapplication of the law regarding implied malice.

The court's remarks do not unambiguously establish that the court misunderstood or misapplied the law. The statement, "this is outrageous and shocking conduct that implies malice" does not unambiguously show that the court believed implied malice is established merely by "outrageous and shocking conduct." The description (outrageous and shocking) is fairly read as merely an off-hand, non-legal characterization of defendant's conduct.

Nor do we discern any clear misapplication of the law from the court's remarks that defendant "should have known that this would result in death," and that defendant acted with "reckless indifference to life." In context, such characterizations of defendant's conduct support a determination that he aided and abetted second degree implied malice murder, i.e., that he knew that the perpetrator intended to commit a life-endangering act, knew that the act was dangerous to human life, and knew that it was done with conscious disregard for human life. To the extent the court lumped in this theory with

17

a theory no longer available (the natural and probable consequences doctrine), any reference to the invalid theory does not invalidate the court's separate findings that defendant aided and abetted the killing and acted with implied malice.

## DISPOSITION

The order denying defendant's petition for resentencing under former section 1170.95 is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


WILLHITE, Acting P. J.

We concur:


COLLINS, J.


CURREY, J.